AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means                    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Central District of California

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>DERRICK POLK | )<br>)<br>)<br>)    Case No.  2:21-MJ-03195<br>)<br>)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

> See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

> See Attachment B

Such affidavit(s) or testimony are incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to <u>18 U.S.C. § 3103a(b)</u>, I find that immediate notification may have an adverse result listed in <u>18 U.S.C. § 2705</u> (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for____days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     <u>7/7/21; 10:18AM</u>                *John E. McDermott*
                                                                                    _____
                                                                                    *Judge's signature*

City and state:      <u>Los Angeles, CA</u>                    <u>Hon. John E. McDermott, U.S. Magistrate Judge</u>
                                                                                    *Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

GOVERNMENT
EXHIBIT
11

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

(Page 2)

## Return

| Case No.:<br>2:21-MJ-03195 | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  2:21-MJ-03195 |
| DERRICK POLK | ) ) ) ) ) | |

```
                              FILED
                    CLERK, U.S. DISTRICT COURT

                      7/7/21

                    CENTRAL DISTRICT OF CALIFORNIA
                    BY: _____ slo _____ DEPUTY
```

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343 and 1956, | See affidavit |
| 21 U.S.C. §§ 841 and 846. | |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Lyndon Versoza
_____
*Applicant's signature*

Postal Inspector Lyndon Versoza
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  7/7/21
_____

John E. McDermott
_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. John E. McDermott, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

## ATTACHMENT A

## PERSON TO BE SEARCHED

The person to be searched is:

DERRICK POLK, a black male, about six foot tall, weighing around 230 pounds, and born in 1963.  DERRICK POLK is assigned California Driver's License Number B3354888, the photo of which follows:



**ATTACHMENT B--POLK**

**I.  ITEMS TO BE SEIZED**

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1343 (wire fraud) and 1956 (money laundering) and 21 U.S.C. §§ 841 and 846 (drug trafficking) (the "Target Offenses"), namely:

a.  Controlled substances, precursor chemicals, and related items and paraphernalia such as cutting and packaging material, scales, pay-owe sheets, and documents and records referring or relating to the same, including those that are opaque as to units (e.g., "I need ten right now").

b.  Firearms and related items such as ammunition and holsters, money counters, and documents referring or relating to the same;

c.  Documents and records referring or relating to law enforcement or bank investigations, accounts being frozen or closed or at risk of the same, currency transaction reports, and manipulating transaction amounts to avoid scrutiny;

d.  Records, programs, and items relating to the counterfeiting or manipulation of documents and identifications, such as the cutting-and-pasting of signatures, letterheads, watermarks, and seals, including the altered or counterfeited information itself.

e.  Documents and records referring or relating to cash transactions totaling over $10,000 or the purchase of more than $3,000 of postal money orders in a two-week period, or conducting multiple cash ATM transactions or purchasing multiple postal money orders on the same day;

f.   Documents and records referring or relating to having one person conduct financial transactions on behalf of a different person, or which purport to show a person-to-person loan or payment on such a loan of at least $1,000;

g.   Mail matter and shipping packages, opened or unopened, not addressed to or from 5025 Pacific Coast Highway, #P307, Long Beach, California, 90804;

h.   Personal identifying information of individuals other than those residing at 5025 Pacific Coast Highway, #P307, Long Beach, California, 90804, including social security numbers, other identifying numbers, dates of birth, credit, debit card, or other account information, PINs, credit reports, and bank or other financial institution information, and records referring or relating to such information;

i.   Records relating to wealth and the movement of wealth since 2015, such as tax returns and forms, crypto-currency accounts and transfers, other digital wealth storage and transfer methods including PayPal and Venmo, money orders, brokerage and financial institution statements, wire transfers, currency exchanges, deposit slips, cashier's checks, transactions involving prepaid cards, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, real estate mortgage initial purchase loans or loan refinances, residential property leases, escrow accounts, the purchase, sale, or leasing of automobiles or real estate, or auto loans, and investments, or showing or referring to purchases or transactions for more than $1,000;

j.   Records or items containing indicia of occupancy, residency or ownership of any location or vehicle being searched,

2

such as keys, rental agreements, leases, utility bills, identity documents, cancelled mail, and surveillance video;

k. Currency, money orders, and casino chips with a value in excess of $1,000, including the first $1,000 if more than $1,000 is found, precious metal coins and bullion, Bitcoin and other digital currency as well as related documents and programs, and prepaid debit or credit cards;

l. Documents and keys relating to public storage units, rental cars, prepaid cellular telephones, safety deposit boxes, Commercial Mail Receiving Agencies, virtual offices, or receiving mail at someone else's address, or holding or renting assets or items under someone else's name;

m. Documents and records showing electronic and telephone contacts and numbers called or calling, such as SIM cards, address books, call histories, telephone bills, and ICQ, Telegram, and email addresses;

n. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the TARGET OFFENSES, and forensic copies thereof.

2. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.   records of or information about Internet Protocol addresses used by the device;

i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

5.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team will not search for similar evidence outside the scope of the items to be seized without first obtaining authority to do so.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the

government may make and retain copies of such data, and may access such data at any time.

   f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

   g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

   h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

   6. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

8.    During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumbs and/or fingers of DERRICK POLK onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of that person with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the

8

contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant, and do not apply to any other search of digital devices.

**AFFIDAVIT**

I, Lyndon A. Versoza, being duly sworn, hereby depose and state
as follows:

### I.    TRAINING AND EXPERIENCE

1.    I am a United States Postal Inspector employed by the
United States Postal Inspection Service ("USPIS"), Los Angeles
Division, in Los Angeles, California, where I have served since
June 2005.  Currently, I am responsible for investigating
criminal violations of money laundering and structuring laws,
such as when the services of the United States Postal Service
are employed by criminals as part of the means to launder or
conceal illicit funds, and/or avoid banking reporting
requirements.  I am also one of seven Postal Inspectors in the
U.S. currently designated by USPIS as a Subject Matter Expert
("SME") in money laundering investigations.  As a SME, I have
spoken at money laundering conferences and provided training to
the financial and banking industry and other law enforcement
agents. I have also received both formal and informal money
laundering training from USPIS and other government and private
agencies.  During my 16-year career as a Postal Inspector, I
have investigated: mail thieves, burglars, rapists, murderers,
armed robbers, prison and street gangs, drug trafficking
organizations, and perpetrators of financial violations

(including money launderers, darknet vendors, digital currency launderers, identity thieves and fraudsters).  For approximately five years prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking. In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking domestically and internationally.  In that capacity, I also earned a designation by USPIS as a SME in Child Exploitation Investigations.

2.    From 2002 to 2005, prior to my service as a US Postal Inspector, I served as a law enforcement officer with the US Immigration and Naturalization Service, which later became part of the US Department of Homeland Security.  In this capacity I enforced immigration and customs law at an international airport and seaport, and later, worked in an intelligence unit for local and national counter-terrorism and smuggling operations.

3.    I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly.  This affidavit does not purport to set forth my complete knowledge or understanding of

the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.  All figures, times, and calculations set forth herein are approximate.

**II.    SUMMARY AND PURPOSE OF AFFIDAVIT: SEARCH WARRANTS**

4.    This affidavit is made in support of applications for warrants to search the following:

a.    5025 E. PACIFIC COAST HIGHWAY, #P307, LONG BEACH, CALIFORNIA, 90804 (the "POLK PREMISES"), which is the residence of DERRICK POLK ("POLK");

b.    The person of DERRICK POLK;

c.    3576 ROCK BUTTE PLACE, PERRIS, CALIFORNIA 92570 (the "MITCHELL PREMISES"), which is the residence of MITCHELL WAYNE MAGEE ("MITCHELL");

d.    27437 MURRIETA ROAD, STORAGE UNIT NUMBER 265, SUN CITY, CA 92585 (the "MITCHELL STORAGE UNIT"), which is a storage unit leased by MITCHELL under a stolen identity; and

e.    14126 CORDARY AVENUE, APARTMENT 22, HAWTHORNE, CALIFORNIA, 90250 (the "MICHAEL PREMISES"), which is the residence of MICHAEL DWAYNE MAGEE ("MICHAEL").

f.    Collectively, POLK, MITCHELL and MICHAEL shall be referred to as the "TARGET SUBJECTS."

g.    Collectively, the POLK PREMISES, the person of

- 3 -

DERRICK POLK, the MITCHELL PREMISES, the MITCHELL STORAGE UNIT, and the MICHAEL PREMISES shall be referred to as the "TARGET PREMISES."

5.  As described in more detail below, I believe that TARGET PREMISES will yield fruits and evidence of violations of 18 U.S.C. §§ 1343 (wire fraud) and 1956 (money laundering) and 21 U.S.C. §§ 841 and 846 (drug trafficking) (the "Target Offenses"). The premises to be searched, and the items to be seized, as described more fully in Attachments A and B, which are incorporated by reference.

SUMMARY OF CONNECTION BETWEEN THE TARGET SUBJECTS

6.  As described in more detail below, the TARGET SUBJECTS appear to be conspirators: they all have criminal convictions, all stored proceeds of their crimes at U.S. Private Vaults, their toll records show that they speak to one another and, after an unnamed co-conspirator appeared to identify surveillance officers, all turned off their phones at the same time, making it impossible for officers to track them by their phones.

POLK Summary

7.  On April 13, 2021, the Honorable U.S. Magistrate Judge Jaqueline Chooljian authorized a warrant for the cell-site information, GPS information, and information from a cell-site simulator on DERRICK POLK's Telephone ("POLK TELEPHONE") (2:21-

MJ-01750).  Judge Chooljian also authorized a warrant to search
a safety deposit box belonging to POLK.  Inside POLK's box was
$399,000 in cash. This cash was placed in front of a certified
drug K9 who alerted to odors of drugs. On June 17, 2021, the
Honorable U.S. Magistrate Judge Paul L. Abrams authorized the
extension of the warrant for the cell-site information, GPS
information and information from a cell-site simulator on the
POLK TELEPHONE (2:21-MJ-02926). The following is a summary of
the investigation into POLK:

     a.   POLK is currently on state probation for perjury
with full search conditions, is a registered sex offender, and
has a slew of criminal convictions, many violent, in Illinois
and California dating to the 1980s until his most recent
California felony conviction of perjury in 2018. POLK's
California and Illinois state felony convictions include:
several counts of aggravated criminal sexual assault, robbery,
two separate convictions for domestic violence and many felony
drug possession convictions.  POLK was also convicted federally
of a bank fraud scheme and for being a felon in possession of a
firearm. POLK also lies to his probation officer that he has no
home and is destitute.

     b.   Through the use of the POLK TELEPHONE's GPS
location, as authorized by Judge Chooljian's and Judge Abrams'
warrants, I learned that POLK actually lives at the POLK

- 5 -

PREMISES (a luxury apartment) and drives a luxury SUV in Long
Beach, California.

        c.    During the investigation of POLK, I also learned
that a separate drug trafficking investigation was being
conducted out of the Western District of Pennsylvania ("WDPA").
Beginning May 10, 2021, as part of a larger drug trafficking
conspiracy investigation, the WDPA investigators initiated a
Title III phone intercept on their targets to include the POLK
TELEPHONE.  From these intercepts, I learned from FBI and HSI
investigators in WDPA that POLK is a drug supplier who supplies
drugs to and receives cash from local WDPA targets through the
use of the US Mails.  I also learned that POLK often talks with
MITCHELL about laundering money and fraud, and the seizure of
his cash at USPV.  POLK also talks with MICHAEL about the
seizure of their cash at USPV.

        MITCHELL MAGEE Summary

    8.    On April 23, 2021, the Honorable U.S. Magistrate Judge
Steve Kim authorized a warrant for the GPS location and the use
of a cell site simulator on MITCHELL MAGEE's cellphone
("MITCHELL TELEPHONE") (2:21-MJ-02005). This warrant expired on
June 7, 2021.  Judge Kim also authorized a warrant to search a
safety deposit box belonging to MITCHELL.  Inside MITCHELL's box
was $600,980 in cash. This cash was placed in front of a
certified drug K9 who alerted to odors of drugs. On June 17,

2021, the Honorable U.S. Magistrate Judge Paul L. Abrams authorized the extension of the warrant for the cell-site information, GPS information and information from a cell-site simulator on the MITCHELL TELEPHONE (2:21-MJ-02926). The following is a summary of the investigation into MITCHELL:

a.  MITCHELL has an extensive state criminal history, with a few convictions for drug trafficking.  MITCHELL was also convicted federally of a bank fraud scheme and for being a felon in possession of a firearm, he was ordered to pay $56,000 in restitution for that case, of which he still owes over $35,000. Records I reviewed from California's Employment Development Department indicate that he is not employed.  Financial records I reviewed show that as recently as November 2020, MITCHELL spent large amounts of unexplained cash.

b.  Based on his GPS coordinates, I am able to consistently see that most days and nights MITCHELL is at the MITCHELL PREMISES.  Using GPS coordinates I was able to place MITCHELL at the MITCHELL STORAGE UNIT.  I later confirmed that MITCHELL rented the MITCHELL STORAGE UNIT using a counterfeit identity card and a stolen identity. I confirmed with the ID theft victim that MITCHELL did not have permission to use his identification. I reviewed video of MITCHELL accessing the MITCHELL STORAGE UNIT and saw that he removed a plastic storage bin from the storage unit and placed it in his BMW.  A drug

- 7 -

detecting K9 sniffed the outside of the MITCHELL STORAGE UNIT and the Drug K9 alerted to the odor of illegal drugs.

c.  I read WDPA Title III intercept transcripts from a May 24, 2021, phone call MITCHELL had with POLK in which it appears MITCHELL, who is a convicted felon, may have a firearm. In another intercepted conversation, it appears that MITCHELL and POLK discuss fraud.

MICHAEL MAGEE Summary

9.  On April 27, 2021, the Honorable U.S. Magistrate Judge Michael R. Wilner authorized a warrant for the GPS location and the use of a cell site simulator on the MICHAEL TELEPHONE (2:21-MJ-02054). This warrant expired on June 11, 2021. Judge Wilner also authorized a warrant to search a safety deposit box belonging to MICHAEL.  Inside MICHAEL's box was $305,000 in cash. This cash was placed in front of a certified drug K9 who alerted to odors of drugs. On June 17, 2021, the Honorable U.S. Magistrate Judge Paul L. Abrams authorized the extension of the warrant for the cell-site information, GPS information and information from a cell-site simulator on the MICHAEL TELEPHONE (2:21-MJ-02926). The following is a summary of the MICHAEL investigation:

a.    MICHAEL has an extensive criminal history, including federal cocaine trafficking charges.  Records I reviewed from California's Employment Development Department

- 8 -

indicate that he is not employed. The state of California also has no records of him filing income taxes since 2014. Financial records I reviewed show that MICHAEL is engaged in structuring transactions to avoid banking reporting requirements. Structuring is a form of hiding illegal income that a structurer is trying to keep undetected from the government.

b.    GPS locations for MICHAEL occasionally place him at the MITCHELL STORAGE UNIT at the same time as MITCHELL.

c.    GPS coordinates consistently show that MICHAEL lives at the MICHAEL PREMISES.

d.    I read WDPA Title III intercept transcripts in which MICHAEL and POLK talk about their wealth seized from USPV.

### III. <u>PROBABLE CAUSE STATEMENT AND PREVIOUS WARRANTS</u>

10.  From my role as a case agent in the investigation as well as from speaking with the case agents from the Federal Bureau of Investigation ("FBI") and Drug Enforcement Administration ("DEA") and reading their reports, I know that U.S. Private Vaults is a business in a strip mall that rents safety deposit boxes anonymously. It is owned and managed by criminals who engage in money laundering, drug trafficking, and structuring, among other offenses. Its business model is designed to appeal to criminals for customers. It charges many times what banks do for similar safety deposit box rentals, but staff conduct countersurveillance for customers, alert them to law

enforcement investigations, and structure transactions for them
to avoid filing currency reports--in addition to providing them a
place to store criminal proceeds anonymously. USPV also launders
for its customers cash that is purported to be drug proceeds by
converting it into precious metals or wire transfers. The great
majority of USPV customers pay cash to rent their safety deposit
boxes, at least some of which USPV then deposits into their own
bank account, which it uses to pay its operating expenses. By
using its customers' criminal proceeds to maintain its own
anonymous facility for the storage of criminal proceeds, USPV
engages in money laundering.

11.  I know from reading the indictment that on March 9,
2021, USPV was indicted by a federal grand jury for conspiring
with its customers and others to launder money, distribute drugs,
and structure financial transactions to avoid currency reporting
requirements.  A copy of that indictment is attached and
incorporated.

12.  Beginning on March 22 through March 26, 2021, I, along
with agents from USPIS, FBI and DEA executed federal search and
seizure warrants at USPV which authorized, among other things,
seizing the nests of safety deposit boxes at USPV as evidence and
instrumentalities of the offenses committed by USPV.  The
warrants did not authorize criminal searches of the contents of
the individual boxes but specified that agents would conduct an

inventory of the contents in accordance with their written
procedures, and were authorized to look for contact information
in those individual boxes in order to notify the boxholders of
the seizure so that they could seek the return of their property.
An inventory search was conducted on all the boxes at USPV,
including the Safety Deposit Boxes belonging to UT, POLK,
MITCHELL and MICHAEL.

**POLK**

A. <u>POLK Asserts He Rented What Turned Out to Be BOX 5911</u>

13.  On or about March 22, 2021, while the search warrant
on USPV was being executed, a person later identified as POLK
walked up to law enforcement officers guarding the perimeter of
the search operation.  I later learned that POLK provided
officers his name, identification card, contact information.

14.  I also learned that on March 26, 2021, POLK submitted
his name, email address and the POLK TELEPHONE on an USPV claim
form on the FBI's website.

15.  On April 6, 2021, I called the POLK TELEPHONE and
spoke with a person who identified himself as POLK.  I asked him
for his box number and he stated it was 5711.  I asked him if he
was sure, and POLK responded that he might be off by one, and
suggested 5712.  (In fact, as discussed later, his is BOX 5911,
which is on the same row as 5711, the box POLK erroneously

claimed as his, but two boxes to the right.)  POLK added that regardless of the box number, he has a key and his retina and palm print (which I know was used by the business to allow customers access the vault area) would be registered with USPV. POLK also stated that he left his information on top of his box. On the same day, I again spoke with POLK through the SUBJECT TELEPHONE.  I asked POLK what was in his box.  POLK responded "cash."  I then asked how much to which he told me to count it.

16.  On April 6, 2021, I reviewed a spreadsheet that summarized the inventory of BOX 5711, and that box did not belong to POLK.  However, BOX 5911, had his contact information and $399,000 in cash in it.  I know from reviewing the sketches of the search, that box 5711 and 5911 are located with only one box between them.  Both are in the same row, and same section of boxes.

17.  Later, I spoke with DEA Special Agent Justin Carlson ("SA Carlson"), who reviewed a law enforcement video of the inventorying of box 5711 and BOX 5911. From his review of the video, SA Carlson told me that box 5711 had indicia belonging to someone else, while BOX 5911 had POLK's information such as his name, signature and the POLK TELEPHONE and Box Number 5911, written on a U.S. Private Vaults "Executor/Conservator Notification Letter."

B.    Drug Detecting K9 Alerted to the Cash in BOX 5911

18.    On April 8, 2021, I spoke with Officer Rowland, who is a K9 Officer for Chino Police Department. Officer Rowland told me that on March 23, 2021 at 0049 hours, while the search warrant for USPV was being executed, federal agents presented the cash from BOX 5911 to his drug detecting K9, "Kobra." Officer Rowland told me that Kobra alerted to the presence of the odor of illegal drugs emitting from the contents of BOX 5911.

19.    I also spoke with Officer Rowland who told me that: Kobra has received 240 hours of basic training and receives continual training every week.  As part of her regular training and yearly certification process, Kobra is subjected to blind, controlled tests in which different types of illegal drugs are hidden in different places in a large training facility.  Her handler does not know where the drugs are.  If the K9 alerts to an area that does not contain drugs, or fails to locate any of the drugs, she would fail and not be certified.

C.    POLK's Criminal History

20.    On April 7, 2021, I reviewed POLK's criminal records and case files and learned that POLK has been convicted of numerous federal and state crimes. POLK is registered sex offender.  His California and Illinois state felony convictions include: several counts of aggravated criminal sexual assault,

- 13 -

robbery, two separate convictions for domestic violence and many felony drug possession convictions.  POLK was also convicted out of the US District Court of New Jersey for a bank fraud scheme and for being a felon in possession of a firearm in 2010.  He was sentenced to 70 months prison and five years' supervised release. POLK was released from federal custody in 2013.  His most recent conviction is a 2019 California state felony conviction for Perjury.

### D.    POLK is on Probation with Search Conditions

21.  On April 7, 2021, I reviewed records from Los Angeles County Probation which indicated that POLK is on probation for his 2019 perjury conviction.  As terms of his probation, POLK is to submit his person and property to search and seizure at any time of the day or night, by any probation officer or other peace officer, with or without a warrant, probable cause or reasonable suspicion.

22.  On April 7, 2021, I spoke with POLK's probation officer, who told me that POLK is a transient and does not have a home address registered with the probation department.  POLK, according to his probation officer, is not currently employed.

23.  On April 7, 2021, I reviewed records from the California Employment Development Division, and learned that POLK does not have a job.  POLK also does not have an address registered with the employment department.

E. POLK's Financial Activity

24.  On April 7, 2021, I reviewed banking and financial records related to POLK.  From my review I learned the following:

a.    From reading records from Bank of America, I learned that between March and September 2015, POLK was part of a credit card account take over scheme.  In this scheme, victims' credit cards were stolen and were used for fraudulent cash advances and purchases totaling a financial loss to Bank of America of over $17,000.  POLK and his conspirators were able to perpetrate the scheme by adding themselves to the victim accounts as authorized users.

25.  I also read an IRS 8300 Report[1] filed by Ben Bridge Jewelers.  From this filing, I learned that in November 2020, POLK bought merchandise from Ben Bridge Jewelers totaling $29,893, $22,393 of which was in cash.

F. POLK  TELEPHONE  GPS  AND  INTERCEPTED  CONVERSATIONS  WITH MITCHELL

26.  Through the use of the POLK TELEPHONE's GPS location as authorized by Judge Chooljian's warrant, I learned that POLK (who purports  to  his  probation  officer  that  he  is  destitute  and  a

---

[1] I know that each person engaged in a trade or business who, in the course of that trade or business, receives more than $10,000 in cash in one transaction or in two or more related transactions, must file this form.

- 15 -

transient living in the Los Angeles Skid Row area) actually lives in a luxury apartment and drives a luxury car in Long Beach, California.

27.   During the investigation of POLK, I also learned that a separate drug trafficking investigation was being conducted out of the Western District of Pennsylvania ("WDPA"). Beginning May 10, 2021, as part of a larger drug trafficking conspiracy investigation, the WDPA investigators initiated a Title III phone intercept on their targets to include the POLK TELEPHONE. From these intercepts, I learned from FBI and HSI investigators in WDPA that POLK is a drug supplier who supplies drugs to and receives cash from local WDPA targets through the use of the US Mails.  I also learned that POLK often talks on the phone with MITCHELL and MICHAEL.  Some of the intercepted conversations include:

MITCHELL, a Felon, Has a Firearm

        a.    On May 24, 2021, during a phone call MITCHELL had with POLK at their respective SUBJECT TELEPHONES, MITCHELL said "I'm tryna to see who coming up the stairs." To which POLK responded, "You pull ya gun out?" MITCHELL responds "Nah."  From this conversation I learned that MITCHELL, who is a convicted felon, may have a gun at his home.

POLK Sells Drugs to the WDPA

        b.    On another call that occurred on May 12, 2021,

- 16 -

POLK discusses conducting various crimes:

```
WDPA TARGET 1 ("PA1"):   I called you last night, man. I
     cracked into that shit, man that shit didn't even, got
     me the fuck high man.
POLK:     What happened?
PA1:      I cracked in that shit. That shit got me high
     touching all that shit.
POLK:     You got that shit?
PA1:      Not that...I can't, I can't hear you.
     [BACKGROUND: UM: ... I had to get cut...] Hello?
POLK:     Wait a minute, you cracked into what shit?
PA1:      Can you hear me old head?
POLK:     What you say?
PA1: I said "Nah, I was fuc-, me and [PA2] was fucking wit'
     some shit last night and I cracked into it..."
[VOICES OVERLAP]
POLK:     Oh.
PA1:      And meanwhile, yeah, and shit, yeah, that shit
     had me high as a motherfucker. I fell asleep.
POLK:     Oh.
PA1:      So...
POLK:     That other shit looks like it's gone, dog.
  ….
```

       c.    From reading the transcripts and speaking with

WDPA case agent, Homeland Security Investigations Special Agent

Robert Connelly ("SA Connelly"), my training, experience, and

his knowledge of the WDPA investigation and the plain language

utilized by PA1 and POLK, I believe that during this call, PA1

explained that he opened some of the narcotics supplied by POLK

and that he got high just from touching it ("…I cracked into

that shit…That shit got me high touching all that shit").  PA1

stated that he and PA2 were processing the narcotics ("…me and

[PA2] was fucking wit' some shit last night and I cracked into

it..."). POLK acknowledged and explained that the other supply

- 17 -

of narcotics was gone ("Oh…That other shit looks like it's gone, dog").  The call continued:

```
    ….
    POLK:      Yeah, yeah, where [PA2] ass at?
    PA1:       Uh, I talked to the nigga this morning. I don't
               know where at right now.
    [VOICES OVERLAP]
    POLK:      That nigga still ain't put my money in the mail
               yet. That nigga take all day doing some shit.
    PA1:       Didn't y'all talk about that shit last night?
    POLK:      Yeah, he said he was gon'...I don't know what the
               fuck he sayin'. I...I don't remember what he said. I
               think he said something about he's gon' do it in a
               couple of days.
    [VOICES OVERLAP]
    PA1:       That's why I gave him the phone. I said, "I don't
               know." I, I gave him the phone.
    POLK:      Yeah, he said it's gon' be couple of days or
               something. I don't know. I can't worry about that
               shit. I got other shit goin' on.
    PA1:       Nah, he's definitely gon' send that shit, for
               sure. He know better than that he-, we family, we
               don't do family like that.
    ….
    PA1:       Yeah, man, what's up with'chu though?
    POLK:      And I'm tryna, I'm tryna put...Sham together.
    PA1:       You gon', you just gon' get wit' Mitch or no?
    POLK:      It's gon' be, it's gon' be whatever, shit. Mitch
               ain't doing nothin'...That nigga, that nig ain't tryna
               do nothing homie.. and he def-, and he def-, and he
               definitely tellin' me.
    PA1:       Oh, he ain't been lying so.
    POLK:      Yeah, so, you know... But, anyway, matter of fact
               that nigga calling me now. Let me, let me hit you
               back.
    ….
```

d.    I believe that during call, POLK asked about PA2 and if PA2 had mailed the money that he owed POLK for a resupply of narcotics ("Yeah, yeah, where[PA2] ass at…That nigga still ain't put my money in the mail yet").  PA1 reassured POLK that

- 18 -

PA2 would mail him the money ("Nah, he's definitely gon' send that shit, for sure"). PA1 asked about POLK's current status ("Yeah, man, what's up with'chu though") and POLK responded he was attempting to put a fraud scheme together ("I'm tryna put...Sham together"). PA1 asked if POLK was going to do the fraud scheme with MITCHELL ("…you just gon' get wit' Mitch or no?"). POLK responded that he needed to hang up with PA1 because MITCHELL was calling POLK on his disposable line ("…matter of fact that nigga calling me now. Let me, let me hit you back"). WDPA Agents later confirmed that wire interceptions revealed that POLK placed an outgoing call at 5:13 p.m. to MITCHELL on MITCHELL TELEPHONE after disconnecting with PA1.

POLK Discusses Laundering Money

        e.    On May 13, 2021, at 9:49 p.m., PA1, placed an outgoing call to the POLK TELEPHONE.  The call is summarized in pertinent parts below:

        ……
        PA1:  Um, I got a question for you.
        POLK:      Mm-hm.
        [VOICES OVERLAP]
        PA1: And, hopefully, you can answer this for me. Say I got a
             business. Remember you was telling me before about that
             business account shit? And the wire shit, and all that
             when you was, like, them niggas ain't hungry, Mitch [PH]
             and them ain't hungry and all that.
        POLK:      Yeah.
        PA1: So, say I get this money wired to my business account,
             right?
        POLK:      Okay.
        PA1: And then I slowly but surely empty it out into another

```
            account, right?
POLK:       Mm-hm.
PA1: Overseas or whatever.
POLK:       Mm-hm.
PA1: But I never go in a... I never go to the ATM. I never go
     to the bank and make a withdrawal or nothin'. Right?
POLK:       Mm-hm.
PA1: And if, well wherever the money come from, if they try
     to dispute or say it's some-some bullshit or whatever
     case may be. Then it's though I never went to the fucking
     ATM, I never withdrawed it and none of that shit. How,
     how can I... is it believable? Or or probable...
POLK:       That you... that you didn't get it?
PA1: Exactly.
POLK:       Yeah.
……
```

f.    I believe that during call, PA1 asked POLK if he
could launder money by moving the funds from account to account,
and not appear in person at branch ("And, hopefully, you can
answer this for me. Say I got a business. Remember you was
telling me before about that business account shit?").  PA1
continued that POLK's co-conspirator MITCHELL is not motivated
to make money ("And the wire shit, and all that when you was,
like, them niggas ain't hungry, Mitch and them ain't hungry and
all that"). PA1 informed POLK about his plan to obtain the money
covertly from the bank and have deniability that he received it
("So, say I get this money wired to my business account,
right…And then I slowly but surely empty it out into another
account, right…And if, well wherever the money come from, if
they try to dispute or say it's some-some bullshit or whatever
case may be. Then it's though I never went to the fucking ATM, I

never withdrawed it and none of that shit. How, how can I...is
it believable? Or, or probable...") POLK confirmed he understood
the question ("That you... that you didn't get it"). PA1
affirmed and POLK agreed ("Yeah"). The call continued:

> ….
> PA1: Do you got a way, do you got access to a way that, you
>      can open up accounts, and, um...shit. Without a person
>      even knowing?
> [VOICES OVERLAP]
> POLK:    I wish I did.
> PA1: Because, at that point a motherfucker just be a ghost.
> POLK:    Man. For real. Back here a couple years ago, it was
>      a lot of motherfuckers that working for, at Wells Fargo
>      was doing that shit. [BACKGROUND: U/I] They would just
>      open up a bank account.
> PA1: Poor motherfucker...
> [VOICES OVERLAP]
> POLK:    Mm-hm.
> PA1: and they wouldn't even know.
> POLK:    Mm-hm, Mm-hm.
> PA1: Damn, we could two or three of them jawns [U/I] that
>      shit.
> POLK:    What's happening.
> PA1:     We need a motherfucker inside, though, that would
>      do some shit like that and don't be spooked.
> …..


POLK Conducts Bank Fraud

       g.    I believe that during this call, PA1 asked POLK
if he knew how to open a bank account that was not traceable
back to the person who opened it ("Do you got a way, do you got
access to a way that, you can open up accounts, and, um...shit.
Without a person even knowing?"). POLK responded he did not ("I
wish I did"). POLK explained that occurred at Wells Fargo when

employees opened bank accounts with unsuspecting individuals'
identities ("Man. For real. Back here a couple years ago, it was
a lot of motherfuckers that working for, at Wells Fargo was
doing that shit…They would just open up a bank account"). PA1
wished that he and POLK had ghost accounts to launder money
through ("Damn, we could two or three of them jawns…We need a
motherfucker inside, though, that would do some shit like that
and don't be spooked"). The call continued:

> ….
> PA1: Because, get this, right? You know, you remember what we
>     did with American, right?
> POLK:     Mm-hm.
> PA1: And then when I went to go get another car, guess who my
>     car loan is in?
> POLK:     Huh?
> PA1: Guess who my car...guess what bank my car loan is in?
> POLK:     The same one?
> PA1: American.
> POLK:     Mm.
> PA1: Ain't that some weird shit?
> POLK:     Mm-hm.
> …..

h.    I believe that during this portion of the call,
PA1 asked if POLK remembered the financial scheme they conducted
with American ("…you remember what we did with American,
right?"). POLK affirmed ("Mm-hm") and PA1 was surprised that the
car loan scheme worked ("And then when I went to go get another
car, guess who my car loan is in?...American…Ain't that some
weird shit").

i.    On May 14, 2021 at 10:53 p.m., PA1, placed an

outgoing call to POLK on the POLK TELEPHONE. The call is

summarized in pertinent parts below.

>     ….
>     PA1: Yeah, I'm a pass on that shit, man. 'Cause I know it's
>          some... I know there be some shit comin' down the pipe,
>          ain't...ain't nobody...ain't no people gonna let all
>          that money go [U/I].
>     POLK:    That's-that's-that's the main thing right there.
>          The-the...if it be any difficulties it's gon' be right
>          in the front with your bank. It ain't gon' be...it ain't
>          gon' be where it's comin' from 'cause where it's comin'
>          from done cleared it. It's gon' be a receivin'
>          motherfucker.
>     PA1:     Yeah. Yeah. Nah, I gotta factor in the pros and
>          cons and, you know, ain't nobody tryin' to get no five
>          years for that shit like...you know, the money look good,
>          but y'know [U/I].
>     [VOICES OVERLAP]
>     POLK:    No, but what people keep fail to realize is, is
>          that they can't give...you know that, listen, they would
>          have to prove that you sent that shit there. They can't
>          prove that. That shit came from wherever the fuck it
>          came from.
>     PA1: Yeah.
>     POLK:    They-they can't...they can't prove shit. You can
>          believe that.
>     PA1: Yeah.
>     POLK:    So, you know, don't, don't, don't, don't think
>          that. Don't give yourself a sentence you that you ain't
>          got now, shit.
>     PA1: Yeah
>     …..

j.    I believe that during this call, PA1 told POLK he

did not want to participate in a financial fraud ("Yeah, I'm a

pass on that shit, man...I know there be some shit comin' down

the pipe…ain't no people gonna let all that money go…"). POLK

attempted to reassure PA1 and explained there would not be

issues with where the funds were coming from ("…if it be any

difficulties it's gon' be right in the front with your bank. It ain't gon' be...where it's comin' from 'cause where it's comin' from done cleared it. It's gon' be a receivin' motherfucker"). PA1 was still uncomfortable and was not interested in getting a five-year prison sentence, although the money was attractive ("…I gotta factor in the pros and cons…ain't nobody tryin' to get no five years for that shit like...you know, the money look good…"). POLK responded that law enforcement would have to prove that PA1 had sent the funds ("No, but what people keep fail to realize is…they would have to prove that you sent that shit there. They can't prove that…").

POLK and MITCHELL Discuss PPP Fraud

      k.    On May 12, 2021, MITCHELL (identified by his voice) using a disposable telephone line placed an outgoing call to the POLK TELEPHONE.  The call is summarized in pertinent parts below:

    POLK:    Yeah.
    MITCHELL: Yeah. Yeah, hey, you ain't, uh... mess with the, um... with the, shit...People was doin' the PPP [PH]?
    POLK:    Hey, listen, listen, listen, listen. Hang up, I'm finna [sic] to call you from another number. On this number.

      l.    I believe that during this call, MITCHELL starts to discuss committing loan fraud through the U.S. Small Business Administration Paycheck Protection Program.  Before details are discussed, POLK stops MITCHELL and tells him that he will call

MITCHELL on his own disposable telephone.

G. POLK Resides at the POLK PREMISES

28.  On April 14, 2021, law enforcement agents from the WDPA told me that PA1 flew to Las Vegas from their district. From GPS coordinates they were tracking, along with intercepted conversations between PA1 and POLK, they believed that PA1 was driving toward Los Angeles from Las Vegas, to meet with POLK. Following the GPS Coordinates pursuant to the federal warrant as authorized by Judge Chooljian, law enforcement initiated surveillance at the POLK PREMISES and observed POLK (identified from his driver's license photo) enter a silver Infiniti Sport Utility Vehicle (license plate number 8TWE803). The Infiniti SUV was registered in POLK's name and was parked at space 202 of the underground parking structure of the POLK PREMISES.

29.  The surveillance team followed POLK, while a secondary surveillance team followed PA1.  The surveillance team saw both PA1 along with others meet with POLK at a Roscoe's Chicken and Waffles restaurant in Inglewood, CA.  POLK was then followed back to the POLK PREMISES by surveillance officers.  The officers observed POLK enter his specific apartment, that is, unit #P307, the POLK PREMISES.

**MITCHELL MAGEE**

H.    MITCHELL Asserts He Rented Safety Deposit BOX 504

30.  From reviewing an FBI claims spreadsheet, I learned

that on March 27, 2021, MITCHELL submitted his name, email address and the MITCHELL TELEPHONE on an USPV claim form on the FBI's website.

31.  On April 13, 2021, I reviewed FBI documents that summarized the inventory of BOX 504.  BOX 504 had MITCHELL's information such as his name, signature and the MITCHELL TELEPHONE and Box Number 504, written on a U.S. Private Vaults "Executor/Conservator Notification Letter."  It also had bundles of rubber banded cash totaling $600,980.

32.  On April 14, 2021, around 10:00 am, I called the MITCHELL TELEPHONE.  A person who identified himself as MITCHELL MAGEE answered the phone.  I overheard MITCHELL using another phone to speak with someone else. MITCHELL ended that phone conversation to speak with me.  MITCHELL told me that his box number is BOX 504.  MITCHELL asserted that he was the only one with access to BOX 504 and had both keys and even "the cute little envelope" the keys came in.  MITCHELL stated that his retina and palm print (which I know was used by the business to allow customers access the vault area) would be registered with USPV. I then asked MITCHELL about the contents in the box, MITCHELL refused to answer and stated that I should know what's in the box.  MITCHELL reasserted he has the key, and is the rightful owner of the box, and any other questions should be directed to his attorney.

I.  Drug Detecting K9 Alerted to the Cash in BOX 504

    33.  On April 13, 2021, I read a declaration from El Monte
Police Detective who handles a drug detecting K9, "Rico." From
his declaration I learned that on March 24, 2021, at
approximately 03:24 am, while the search warrant for USPV was
being executed, federal agents presented the cash from BOX 504
to "Rico."  Detective Girgle said in his declaration that "Rico
conducted a search of the contents of safe number 504 and
alerted to the presence of scent of narcotics on or in the US
Currency."

J.  MITCHELL's Criminal History

    34.  On April 13, 2021, I reviewed MITCHELL's criminal
records and case files and learned that MITCHELL has been
convicted of numerous state crimes and one federal conviction.
MITCHELL's first California felony conviction was in 1989 for
Possession or purchase of cocaine base for sale.  In 1990 he was
arrested for assault with firearm on a person and was convicted
for misdemeanor for exhibiting a firearm.  In 1993 MITCHELL was
convicted again for possession or purchase of cocaine base for
sale.  He was sentenced to three years in prison.  In 1995
MITCHELL was arrested by LAPD for grand theft vehicle.  His
parole was violated for the conduct.  Again in 1996, MITCHELL
was arrested for grand theft vehicle, this time by Hawthorne
Police.  Once again his parole was violated. In 1997 MITCHELL

was convicted of a felony for making a false financial statement
and sentenced to 16 months in prison.  MITCHELL was arrested for
several other state violations, but his next felony conviction
was in 2004 for receiving stolen property.  In 2006, MITCHELL
and his co-conspirator were indicted out of the Western District
of Kentucky for 18 U.S.C. §§ 1028A (aggravated identity theft),
1344 (bank fraud) and 2 (aiding and abetting).  MITCHELL was
convicted and sentenced to a total of 42 months prison, five
years of supervised release, and $56,190 in restitution.

        K.    MITCHELL's Financial Activity

        35.  On April 21, 2021, I learned that the California
Employment Development Department had no record of MITCHELL
being employed.  This further adds to my belief that the cash
found in BOX 504 was not gained lawfully.

        36.  On April 21, 2021, I reviewed records I received from
the US Attorney's Office, Financial Litigation Section.  I also
reviewed MITCHELL's Judgement and Commitment Order from his
criminal conviction from the Western District of Kentucky and
records from the Bureau of Prisons website. From these records,
I learned that MITCHELL was sentenced in 2006 to two years
prison and 5 years supervised release. He was also ordered to
pay $56,190 dollars in restitution, and $200 Special Penalty
Assessment, for a total of $56,390.  MITCHELL was released from
prison in July 2008.  MITCHELL has not paid his restitution to

victims consistently and has only paid $20,431 since March 2007. He has not paid anything toward his restitution since April 2018. MITCHELL has an outstanding balance of almost $36,000.

37. On April 13, 2021, I reviewed an IRS 8300 Report filed by CARMAX. From this CARMAX filing I learned that on November 2, 2020, MITCHELL purchased a 2017 BMW 740 for $47,149, $23,269 of which MITCHELL paid in mostly $100 bills cash. The earliest cash transaction report I found for MITCHELL, for $17,000, was dated April 2015.

L. MITCHELL's Residence and Countersurveillance

38. On April 23, 2021, I spoke with USPIS Task Force Officers who conducted surveillance at the MITCHELL PREMISES. From their surveillance, they observed MITCHELL (identified by his driver's license photograph) leave the MITCHELL PREMISES and drive away in a newer model Range Rover. As soon as he left his driveway, MITCHELL began conducting countersurveillance. MITCHELL came to a stop sign and waited about 10 to 15 seconds. From the stop sign, instead of turning right on the road, he went directly across the street into a different parking complex and waited there about 30 seconds, apparently observing the officer who was attempting to observe him. MITCHELL then went back to the main road where he initially waited excessively at the stop sign. He then sped away, driving by the officer's estimation, over 65mph in a residential area. Officers did not

follow him away.  In the driveway of MITCHELL's residence was
the BMW that MITCHELL previously purchased in part with cash as
described above.  On the curb in front of the home was a newer
model "E" class Mercedes.  The officers also told me that they
observed many cameras all around the two-story MITCHELL
PREMISES.  From surveillance photos, I am able to count seven
cameras on the façade of the home, including four above the
garage, one above the entry way, and two on the roof.  In my
training and experience, drug traffickers often engage in
countersurveillance driving to make sure that they are not being
followed by law enforcement.  Further, they often employ
excessive security measures around their homes, including
surveillance cameras, both to detect law enforcement
surveillance and potential robbers and thieves, as they know
that the drugs and cash they must employ in their illegal trade
makes them inviting targets for other criminals.

   M. MITCHELL Resides at the MITCHELL PREMISES

     39.  Between April 23, and June 30, 2021, I have reviewed
the GPS coordinates to MITCHELL's phone.  From this review, I
determined that MITCHELL resides at the MITCHELL PREMISES. Every
night, or almost every night, MITCHELL PHONE coordinates would
place him within between six to 16 meters of his home.  On May
14, 2021, law enforcement surveillance, observed MICHAEL meet
with MITCHELL at the MITCHELL PREMISES.

N. MITCHELL STORAGE UNIT Leased Under the Name of a Stolen Identity

40.  On May 4, 2021, I was reviewing GPS coordinates for the MITCHELL TELEPHONE.  During this review, I observed that the MITCHELL TELEPHONE's coordinates placed MITCHELL at the MITCHELL STORAGE UNIT, which is not far from the MITCHELL PREMISES.

41.  On May 7, 2021, I visited the storage facility and spoke an employee where I learned:

    a.  The only MAGEE with lease agreement was MITCHELL's brother MICHAEL.  MICHAEL rented parking space at the storage facility to park a trailer which contained jet skis and an off-road vehicle.

    b.  I asked the employee about MITCHELL MAGEE and the employee stated that he did not have any rental agreements with anyone with the name MITCHELL MAGEE.  I then asked the employee to show me the video for the May 4, 2021 and saw MITCHELL drive his BMW to a storage unit.  In my review of the video, I observed MITCHELL access the MITCHELL STORAGE UNIT, which is large storage unit, and place a large plastic bin into the trunk of his white BMW.

    c.  The employee told me that he only knew the person in the video as "R.J."  The employee showed me a copy of R.J.'s lease paperwork which included a photocopy of R.J.'s driver license.  I immediately recognized the person on the photo of the driver license as MITCHELL MAGEE.  According to the storage

- 31 -

facility's business records, "R.J." (MITCHELL) had leased the
MITCHELL STORAGE UNIT since 2018.

d.    On June 9, 2021 I reviewed records from the
Florida Highway Safety and Motor Vehicles. From this review I
learned that the driver license number found in the counterfeit
ID used by MITCHELL is a real driver license under the name R.J.
with the same date of birth. However, the photo of R.J. did not
remotely resemble MITCHELL.

42.  On June 10, 2021 Detective Alfred Morgan of the
Sanford, Florida police department visited the real R.J. and
confirmed he is a real person.  On June 21, 2021, I received an
email from R.J. where I learned that MITCHELL did not have his
permission to use R.J.'s identity.

43.  On May 7, 2021, Riverside County Sheriff K9 Deputy
Austin McGuire, who handles Drug Detecting K9 "Roger," arrived
at the storage facility.  Deputy McGuire presented the area
outside of the MITCHELL STORAGE UNIT to Roger.  I observed, and
Deputy McGuire told me that Roger alerted to the odors of
illegal drugs emanating from the MITCHELL STORAGE UNIT.

44.  Deputy McGuire told me that as part of his yearly
certification process, Roger is subjected to a blind, controlled
test in which different types of drugs are hidden in different
places in a large training facility.  His handler does not know
where the narcotics are.  If Roger alerts to an area that does

not contain drugs, or fails to locate any of the narcotics, he
would fail and not be certified.

45.  I also reviewed records from the same storage facility
for MICHAEL and learned that MICHAEL would also frequent the
storage facility to access his parking space.  Based on the
intermittent pings of his phone, I am unable to determine if
MICHAEL has also accessed MITCHELL's fraudulently obtained
storage unit.  However I observed that on or about May 8, 2021,
and other times, both the MITCHELL TELEPHONE and the MICHAEL
TELEPHONE were at the storage facility at the same time.


                          **MICHAEL MAGEE**
O.   <u>MICHAEL Asserts He Rented a Safety Deposit Box, BOX 4303</u>

46.  From reviewing an FBI claims spreadsheet, I learned
that on March 26, 2021, and again on March 29, 2021, MICHAEL
submitted his name, email address and the SUBJECT TELEPHONES on
an USPV claim form on FBI's website.

47.  On April 15, 2021, I reviewed FBI documents that
summarized the inventory of BOX 4303.  BOX 4303 had MICHAEL's
information such as his name, signature and the SUBJECT
TELEPHONES and Box Number 4303, written on a U.S. Private Vaults
"Executor/Conservator Notification Letter."  It also had bundles
of rubber banded cash totaling $305,000.

48.  On April 19, 2021, around noon, I called the MICHAEL

                          - 33 -

TELEPHONE.  A person who identified himself as MICHAEL MAGEE
answered the phone.  MICHAEL told me that his box number is BOX
4303.  MICHAEL asserted that he was the only one with access to
BOX 4303 and had both keys.  MICHAEL stated that his retina and
palm print (which I know was used by the business to allow
customers access the vault area) would be registered with USPV.
I then asked MICHAEL about the contents in the box, MICHAEL
refused to answer and stated that I should contact his lawyer
for that information.

P.    Drug Detecting K9 Alerted to the Cash in BOX 4303

      49.  On April 13, 2021, I read a declaration from El Monte
Police Detective who handles a drug detecting K9, "Rico." From
his declaration I learned that on March 25, 2021, at
approximately 02:30 am, while the search warrant for USPV was
being executed, federal agents presented the cash from BOX 4303
to "Rico."  Detective Girgle said in his declaration that "Rico
conducted a search of the contents of safe number 4303 and
alerted to the presence of scent of narcotics on or in the US
Currency."

Q.    MICHAEL's Criminal History

      a.    On April 19, 2021, I reviewed MICHAEL's criminal
records and case files and learned that: In 1991 MICHAEL was
convicted for a felony Marijuana over 1 oz.; In 1992 MICHAEL was
convicted for a felony for the state of California for

Possession of narcotic control substance; In 1995 MICHAEL was convicted of a misdemeanor for giving false information to a peace officer; In 1996 MICHAEL was convicted in a federal case and sentenced to 247 months and five years' supervised release for conspiracy to distribute cocaine base.

R.    MICHAEL's Financial Activity

50.  On April 22, 2021, I reviewed a response to my inquiry with the California Employment Development Department.  From this review, I learned that MICHAEL does not have any reported employment to the state.

51.  On April 22, 2021, I reviewed records from the California Franchise Tax Board.  From these records, I learned that going as far back as 2014, MICHAEL has not filed his taxes to the state of California, where he resides[2].

52.  On April 19, 2021, I reviewed banking records related to MICHAEL.  From this review I learned that MICHAEL has been involved in suspicious financial behavior that cannot be explained by his reported finances.  For example, between March 23, 2020 and March 4, 2021, MICHAEL conducted 40 cash deposits ranging from $50 to $9,000 into one of his accounts, which totaled over $190,000.  For these series of transactions, MICHAEL would deposit the cash through ATM machines and over the

---

[2] For 2021, in California, individuals who earned more than $12,400 gross income are required to file state taxes.

counter.  Based on my review, it appears that MICHAEL has regularly engaged in structuring type of activity since at least 2012.  Often, MICHAEL would structure cash into his accounts and other times he would structure cash to buy USPS, Western Union and Other Money Orders, which are also deposited into his accounts.

53.  Based on my training and experience, individuals who profit from crimes often try to hide illicit proceeds by structuring large cash transactions, including cash deposits, cash withdrawals, and purchases of money orders, into smaller transactions below the reporting threshold.

54.  Involvement in illegal activity tends to generate large quantities of cash, which by its nature is fungible. Individuals involved in illegal activity or underreporting their income often will attempt to avoid the filing of banking reports because they do not want law enforcement officials to become aware of cash generated from illegal or unreported activity.

S. MICHAEL Resides at the MICHAEL PREMISES

55.  Between April 27, and June 30, 2021, I have reviewed the GPS coordinates to MICHAEL TELEPHONE.  From this review, I determined that MICHAEL resides at the MICHAEL PREMISES. Almost every night, the MICHAEL TELEPHONE coordinates would place him within between six to 16 meters of his home.  On May 14, 2021, law enforcement surveillance observed MICHAEL (identified by

comparison with his driver's license photograph) enter a white
Chevy Silverado registered to MICHAEL's name, which was parked
at Space 53 of the underground parking structure of the MICHAEL
PREMISES, and followed him to meet with MITCHELL at the MITCHELL
PREMISES and then proceed to the storage facility where the
MITCHELL STORAGE UNIT is also located.

T. Unnamed Target Discovers Law Enforcement Surveillance and all
the SUBJECT TELEPHONES Were Turned Off.

56.  On April 29, 2021, an FBI surveillance team, following
an unnamed target (herein after "Unnamed Target" or "UT") phone
coordinates pursuant to a federal warrant, conducted
surveillance at a residence tied to UT in Inglewood, CA
("Inglewood Address.")  FBI agents later told me that during
this surveillance, UT detected the surveillance team observing
him.  That afternoon, I determined that the cellphone belonging
to UT as well as the MICHAEL TELEPHONE, the MITCHELL TELEPHONE
and the POLK TELEPHONE ("Subject Telephones") were unable to be
located by the service provider, which I know to mean that the
TARGET SUBJECTS turned their cellphones off. Having watched some
of the Subject Telephones for a few weeks, this seemed unusual
to me. To avoid further suspicion from these subjects, I asked
law enforcement surveillance teams to stop surveilling these
TARGET SUBJECTS.  After the surveillance detection, I observed
the Subject Telephones would stay off but once or twice in a
day, they would turn back on.  Over several days, they would

leave them on for longer periods and more often, before shutting
them off.  I estimate that it took over two weeks before the
TARGET SUBJECTS began to leave their phones back on. I know from
reviewing toll records of all the Subject Telephones, the TARGET
SUBJECTS are in regular communication with each other. I believe
that when UT discovered law enforcement surveillance, it is
likely that he directly or indirectly alerted the other targets,
which resulted in all TARGET SUBJECTS turning their phones off.

57.  Based on my training and experience, I know that
surveillance conscious criminals are aware that law enforcement
would exploit mobile devices to locate suspects, listen to
conversations and identify a criminal network. I believe that
the TARGET SUBJECTS reaction to surveillance is indicative of a
criminal behavior.

U. Training and Experience on the Target Offenses

58.  In my training and experience, all drug trafficking
operations necessarily involve conspiracies, as the traffickers
must of necessity negotiate deals with one another, arrange for
the pick-up and transfer of drugs, their sale, and then a
reverse trip for the cash used to purchase the drugs.  Because
drug trafficking is an inherently dangerous business almost
always conducted in cash to avoid a paper trail that
investigators could later follow, drug traffickers prefer to
deal with the same customers, suppliers, couriers, and other

participants repeatedly because they know and trust them from previous deals.  Knowledge of these co-conspirators and maintaining good relations with them is a critical ingredient of successful drug trafficking.  Accordingly, drug traffickers spend time meeting and communicating with their co-conspirators regularly to maintain their business relationships.  While much of this communication is done electronically, often by smart phone, drug traffickers are wary of electronic surveillance and prefer to have their most sensitive conversations face-to-face. Further, physical movement is necessary to conduct trade-offs of cash for drugs, to meet subordinates and suppliers to give them their share of the proceeds, and so on.  In my training and experience, learning the routes that the TARGET SUBJECTS take are likely to lead me to their co-conspirators and the locations they use for their drug trafficking operation.

59.  In my training and experience, almost all financial transactions and communications nowadays cause wire transmissions, often over the internet, which cross state lines in some manner even if the recipient and sender are in the same state, as data tends to be stored in data centers and backup data centers that have little relation to the location of the sender or recipient.

## I. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

60.  Based on my training, experience, and information from

those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

61.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel

- 41 -

may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    62.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

        a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb and/or fingers of the TARGET SUBJECTS on the device(s); and (2) hold the device(s) in front of those persons' faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

63.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IV.  CONCLUSION

64.  For the reasons stated above, there is probable cause to believe that evidence and proceeds of the Target Offenses, as

described more particularly in Attachment B, will be found

during a search of the TARGET PREMISES.


Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by
telephone on this 7th day of July, 2021.



_____
UNITED STATES MAGISTRATE JUDGE

- 44 -

FILED
CLERK, U.S. DISTRICT COURT

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 2:21-cr-00106-MCS |
| Plaintiff, | |
| v. | I N D I C T M E N T |
| U.S. PRIVATE VAULTS, INC., California Corporate Number C3405297, | [18 U.S.C. § 1956(h): Conspiracy to Launder Money; 21 U.S.C. § 846: Conspiracy to Distribute Controlled Substances; 18 U.S.C. 371: Conspiracy to Structure Transactions; 18 U.S.C. § 982(a)(1), 21 U.S.C. §§ 853 and 881(a)(6), 28 U.S.C. § 2461(c) and 31 U.S.C. § 5317(c): Criminal Forfeiture] |
| Defendant. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.   INTRODUCTORY ALLEGATIONS

1.   At times relevant to this Indictment:

a.   Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada Corporation registered with the California Secretary of State, was in the business of renting safety deposit boxes to individuals who wished to do so anonymously.

b.   Co-conspirator USPV Officer was an officer of USPV and

one of its owners.  USPV Officer dealt in marijuana, in violation of the laws of California, as well as cocaine.

c.    Co-conspirator USPV Manager was the manager of USPV. USPV Manager helped USPV Officer arrange drug deals within USPV, and helped USPV customers avoid detection by law enforcement, including by advising them to structure their cash purchases to avoid reporting requirements.

d.    Co-conspirator Gold Business was a dealer in precious metals and jewelry, and shared the same space as USPV, as well as some employees.  Gold Business helped USPV customers convert their cash into gold, and structured their cash transactions to avoid federal reporting requirements.

e.    Co-conspirator USPV Representative One was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative One instructed USPV customers how to structure transactions to avoid federal reporting requirements.

f.    Co-conspirator USPV Representative Two was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative Two instructed USPV customers how to structure transactions to avoid federal reporting requirements.

B.    THE OBJECTS OF THE CONSPIRACY

2.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant USPV conspired with others known and unknown to the Grand Jury to launder money, in violation of Title 18, United States Code, Section 1956, namely:

a.    to knowingly conduct and attempt to conduct financial transactions involving the proceeds of a specified unlawful activity,

1  that is, the distribution of controlled substances, with the intent

2  to promote the carrying on of that specified unlawful activity, in

3  violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

4          b.    to knowingly conduct and attempt to conduct financial

5  transactions involving the proceeds of specified unlawful activity,

6  that is, the distribution of controlled substances, knowing that the

7  transactions were designed in whole or in part to conceal and

8  disguise the nature, location, source, ownership, and control of the

9  proceeds of specified unlawful activity, in violation of Title 18,

10 United States Code, Section 1956(a)(1)(B)(i); and

11         c.    to knowingly conduct and attempt to conduct financial

12 transactions involving the proceeds of specified unlawful activity,

13 that is, the distribution of controlled substances, knowing that the

14 transactions were designed in whole or in part to avoid a transaction

15 reporting requirement under Federal law, in violation of Title 18,

16 United States Code, Section 1956(a)(1)(B)(ii).

17 C.   MANNER AND MEANS OF THE CONSPIRACY

18       3.    The objects of the conspiracy were carried out and were to

19 be carried out, in substance, as follows:

20         a.    Defendant USPV would adopt business practices that

21 attracted customers in possession of proceeds from criminal offenses,

22 including drug trafficking, and not law-abiding persons.  Such

23 practices included: (1) touting the anonymity of the safety deposit

24 rentals that defendant USPV would provide, including by advertising

25 "we don't even want to know your name"; (2) boasting that, unlike

26 banks, its anonymous safety deposit box rentals did not require

27 customer information that "can be easily accessed by government

28 agencies (such as the IRS)"; (3) making arrangements for the payment

3

1    of the rental fees in cash and other ways that would be untraceable;

2    (4) issuing safety deposit box keys that were unmarked and unnumbered

3    so that law enforcement could not determine that the keys unlocked

4    safety deposit boxes at USPV; and (5) charging safety deposit box

5    rental rates several times higher than those at banks.

6         b.    USPV Officer would capitalize defendant USPV with the

7    proceeds of his illegal drug trafficking.

8         c.    USPV Officer would invite other drug traffickers who

9    knew and trusted him because of his illegal drug trafficking to store

10    the proceeds of their drug trafficking at defendant USPV.

11         d.    Employees of defendant USPV would conduct counter

12    surveillance of the neighborhood and warn customers when they

13    observed law enforcement.

14         e.    Agents of defendant USPV would instruct customers to

15    structure transactions to avoid currency transaction reports

16    including by purchasing gold and other precious metals through Gold

17    Business, which would structure transactions and not file required

18    currency reports.

19         f.    If agents of defendant USPV learned that law

20    enforcement was interested in searching or seizing the contents of a

21    particular customer's safety deposit box, they would attempt to warn

22    the customer, delay law enforcement, or even remove all but a nominal

23    amount of cash from the box for the customer, to prevent law

24    enforcement from discovering and seizing the bulk of the cash.

25         g.    Defendant USPV would deposit the cash proceeds it

26    received from its customers for safety deposit box rentals, which

27    included proceeds from the distribution of controlled substances,

28    into its bank account, and then use those proceeds to maintain USPV's

4

anonymous storage facilities for its criminal customers.

       h.   USPV Officer and USPV Manager would negotiate drug deals illegal under California law within the secured space of USPV, and USPV Officer would store the cash proceeds from drug deals within a safety deposit box at USPV.

       i.   USPV Manager would accept cash purportedly from illegal drug sales, and structure transfers of it to Gold Business in amounts not greater than $10,000 at a time in exchange for wire transfers that purported to be for the sale of precious metals.

COUNT TWO

[21 U.S.C. § 846]

4.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

5.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.   MANNER AND MEANS OF THE CONSPIRACY

6.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

7.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

6

defendant USPV could provide in bulk.

Overt Act No. 2: On July 26, 2019, USPV Officer met Confidential Informant 3 within USPV to sell him 1,000 vape cartridges containing THC. USPV Officer delivered the cartridges in the parking lot of USPV, and received in exchange $8,000 in cash within USPV's business location.

Overt Act No. 3: On or about December 11, 2019, during discussions for the sale of cocaine, USPV Officer instructed the buyer, Confidential Informant 3, to use a wireless communication application called "Signal," which is encrypted to communicate with him regarding the transaction.

Overt Act No. 4: On or about December 16, 2019, USPV Officer instructed Confidential Informant 3 to come to USPV to complete the exchange.

Overt Act No. 5: On or about December 16, 2019, USPV Manager called Confidential Informant 3 and explained that co-conspirator USPV Officer was not being careful enough, and could bring unwanted law enforcement attention to defendant USPV by conducting this drug deal onsite.

Overt Act No. 6: On or about December 18, 2019, USPV Officer sold an ounce of cocaine to Confidential Informant 3 through intermediaries.

COUNT THREE

[18 U.S.C. § 371]

8.    The Grand Jury realleges paragraph 1 of this Indictment here.

A.    OBJECTS OF THE CONSPIRACY

9.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.    MANNER AND MEANS OF THE CONSPIRACY

10.    The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.    OVERT ACTS

11.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

8

not limited to the following:

Overt Act No. 1:  On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

Overt Act No. 2:  On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

Overt Act No. 3:  On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

Overt Act No. 4:  On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each:  "That way you don't have to give no social security, no ID. All that shit goes to the IRS."  USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

Overt Act No. 5:  On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

$10,000: "Don't come in every day. . . . what they look for is a pattern of someone who with intention is trying to get around . . ."

Overt Act No. 6: On January 29, 2020, when Undercover Officer explained that he needed more than $10,000 worth of gold quickly, USPV Manager suggested that he split the purchase between himself and Confidential Informant 3, so that each purchase would be under $10,000 individually. USPV Representative One agreed to the ruse "as long as you hand me the money" separately and fill out receipts for two separate transactions. USPV Representative One also agreed that Undercover Officer could pick up the total gold purchase alone the following day.

Overt Act No. 7: On January 29, 2020, USPV Representative One accepted first $9,900 in cash from Undercover Officer and then another $5,000 which Undercover Officer handed to Confidential Informant 3, who then handed it to USPV Representative One.

Overt Act No. 8: On January 30, 2020, USPV Representative One delivered nine ounces of gold bullion to Undercover Officer.

Overt Act No. 9: On November 17, 2020, USPV Manager accepted $25,000 in cash from Confidential Informant 3, who said it was from the sale of "skante" (methamphetamine), and structured the transfer of it to Gold Business in exchange for wire transfers of $10,000 and $12,000, purportedly from the sale of gold, to launder the cash.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.    Defendant USPV shall forfeit to the United States the following property:

    a.  All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

    b.  A sum of money equal to the total value of the property described in subparagraph a above.

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

    a.    The business computers;

    b.    The money counters;

    c.    The nests of safety deposit boxes and keys;

    d.    The digital and video surveillance and security equipment; and

    e.    The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b),

11

defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

and 21 U.S.C. § 853]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 881(a)(6), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, in the event of defendant USPV's conviction under Count Two of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal:

i.   constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; or

ii.   used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

///

13

3.     The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on one or more of the grounds set forth in paragraph 2 above:

      a.     The business computers;

      b.     The money counters;

      c.     The nests of safety deposit boxes and keys;

      d.     The digital and video surveillance and security equipment; and

      e.     The biometric scanners.

4.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1.  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2.  Defendant USPV shall forfeit to the United States the following property:

    a.  All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

    b.  A sum of money equal to the total value of the property described in subparagraph a above.

3.  The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

    a.  The business computers;

    b.  The money counters;

    c.  The nests of safety deposit boxes and keys;

    d.  The digital and video surveillance and security equipment; and

    e.  The biometric scanners

4.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

15

5317(c)(1)(B), and Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/

Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

ANDREW BROWN
Assistant United States Attorney
Major Frauds Section